## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş., | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) Court No. 21-00527 |
| *Defendant,* | ) ) |
| CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., and SSAB ENTERPRISES LLC, | ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2 (FINAL VERSION)

Matthew M. Nolan
Jessica R. DiPietro
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006

August 5, 2022

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş., | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) Court No. 21-00527 |
| *Defendant,* | ) ) ) |
| CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., and SSAB ENTERPRISES LLC, | ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Matthew M. Nolan
Jessica R. DiPietro
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006

March 18, 2021

TABLE OF CONTENTS

**Page**

I.  RULE 56.2 STATEMENT ..................................................................2

II.  ISSUES PRESENTED .....................................................................2

    A.  Whether Commerce applied the proper currency to
    calculate Habaş's Home Market Sales Prices ...............2

III. STATEMENT OF FACTS ................................................................3

IV. STANDARD OF REVIEW ...............................................................8

V.  ARGUMENT ..................................................................................9

    A.  Commerce's Determination Is Not In Accordance With
    Law And Is Inconsistent With Determinations Made
    In Prior Cases .......................................................................9

        1.  Commerce's *Final AD Results* Are Inconsistent
        With Its Prior Determinations and the Law .......11

        2.  Relying on the Reported "Transaction Currency"
        is Consistent With Commerce's Policy and
        Precedent ..................................................................20

    B.  Commerce's *Final AD Results* Create Absurd Results,
    Inconsistent With The Record, Which Supports
    Relying On USD-Denominated Prices In The Home
    Market ..................................................................................23

VI. CONCLUSION ...............................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. U.S. Sec'y of Agriculture,*
   462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006), *appeal
   dismissed*, 260 F. App'x 266 (Fed. Cir. 2007) ...................................... 9

*Atchinson, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of
   Trade,*
   412 U.S. 800 (1973) .......................................................................... 25

*British Steel PLC v. United States,*
   127 F.3d 1471 (Fed. Cir. 1997) .................................................... 10, 19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) .................................................................. 8, 9, 12

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ............................................................................ 8

*DAK Americas LLC v. United States,*
   456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ...................................... 11

*DuPont Teijin Films USA, LP v. United States,*
   407 F.3d 1211 (Fed. Cir. 2005) ............................................................ 8

*Eregli Demir ve Celik Fabrikalari T.A.Ş. v. United States,*
   308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ................................ 22, 23

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.Ş. v. United
   States,*
   498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ...................................... 10

*Nakornthai Strip Mill Pub. Co. v. United States,*
   87 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) .................................. 10, 19

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................ 8

AFDOCS/26086330.1

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995) ........................................................... 12

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001) ......................................................... 11

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ............................................................................ 11

*SunEdison, Inc. v. United States,*
    179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) ................................ 9, 19

*Wheatland Tube Co. v. United States,*
    161 F.3d 1365 (Fed. Cir. 1998) ......................................................... 11

*Union Steel v. United States,*
    713 F.3d 1101 (Fed. Cir. 2013) ........................................................... 8

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................. 8

19 U.S.C. § 1675(a)(1) ............................................................................. 4

19 U.S.C. § 1677b(1)(B)(i) ..................................................................... 12

19 U.S.C. § 1677b(a) .............................................................................. 11

19 U.S.C. § 1677b(f)(1)(A) ..................................................................... 18

19 U.S.C. § 1862 .................................................................................... 28

**Regulations**

19 C.F.R. § 351.213 ................................................................................. 4

**Presidential Proclamations**

*Proclamation 9705 of March 8, 2018, Adjusting Imports of
    Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15,
    2018) ..................................................................................................... 28

*Proclamation 9772 of August 10, 2018, Adjusting Steel Imports Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018)..................................................................28

## Administrative Determinations

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 81 Fed. Reg. 15231 (Dep't Commerce Mar. 26, 2016) affirm. LTFV prelim. determ. & postponement of final determ.), and accompanying Preliminary Determination Memorandum..............................................................21

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 81 Fed. Reg. 53428 (Dep't Commerce Aug. 12, 2016) (final affirm. LTFV determ.), and accompanying Issues and Decision Memorandum ........................................21

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 84 Fed. Reg. 30694 (Dep't of Commerce June 27, 2019) (final AD determ. & final no shipments results; 2016-2017), and accompanying Issues and Decision Memorandum................................................................. *passim*.

*Certain Hot-Rolled Steel Flat Products From Republic of Turkey*, 84 Fed. Reg. 68878 (Dep't Commerce Dec. 17, 2019) (prelim. AD results & determ. of no shipments; 2017-2018), and accompanying Preliminary Decision Memorandum................................................................17

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 85 Fed. Reg. 63098 (Dep't of Commerce Oct. 6, 2020) (final AD results & final determ. no shipments; 2017-2018)................................................................16

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018–2019*, 86 Fed. Reg. 11227 (Dep't Commerce Feb. 24, 2021), and accompanying Preliminary Decision Memorandum ........................................................7

AFDOCS/26086330.1

*Certain Hot-Rolled Steel Flat Products From the Republic of
Turkey: Final Results of Antidumping Duty
Administrative Review and Final Determination of No
Shipments;* 2018–2019, 86 Fed. Reg. 47058 (Dep't
Commerce Aug. 23, 2021), and accompanying Issues and
Decision Memorandum............................................................. *passim.*

*Stainless Steel Plate in Coils from the Republic of Korea*, 66
Fed. Reg. 45279 (Dep't of Commerce Aug. 28, 2001)
(amend. final LTFV determ.)................................................. 13

*Welded Carbon Steel Standard Pipe and Tube Products
From Turkey*, 82 Fed. Reg. 49179 (Dep't of Commerce Oct.
24, 2017) (final AD determ. & determ. of no shipments;
2015-2016), and accompanying Issues and Decision
Memorandum........................................................................ 13

**Other Authorities**

*Antidumping or Countervailing Duty Order, Finding, or
Suspended Investigation; Opportunity to Request
Administrative Review*, 84 Fed. Reg. 52068 (Dep't
Commerce Oct. 1, 2019)........................................................ 3

Import Administration Policy Bulletin 98.2: *Imputed credit
expenses and interest rates* (Feb. 23, 1998), *available at*
https://enforcement.trade.gov/policy/bull98-2.htm ..................... 20, 21

AFDOCS/26086330.1

## Glossary of Acronyms and Abbreviations

| AD | Antidumping |
|---|---|
| AR | Administrative Review |
| IDM | Issues and Decision Memorandum |
| HM | Home Market |
| HRS | Hot-Rolled Steel |
| PDM | Preliminary Decision Memorandum |
| TL | Turkish Lira |
| USD | U.S. Dollar |
| VAT | Value-Added Tax |

AFDOCS/26086330.1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş., | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) Court No. 21-00527 |
| *Defendant,* | ) ) ) |
| CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., and SSAB ENTERPRISES LLC, | ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş.

("Habaş") respectfully moves this Court, pursuant to Rule 56.2 of the

United States Court of International Trade for judgment on the agency

record with regard to certain issues decided by the U.S. Department of

Commerce ("Commerce") in the final results of the administrative

AFDOCS/26086330.1

review covering the 2018-2019 period of review of *Certain Hot-Rolled Steel Flat Products From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments;* 2018–2019, 86 Fed. Reg. 47058 (Dep't Commerce Aug. 23, 2021) (*"Final AD Results"*), PR 115, ECF No. 25-4, Appx1078-1080, and accompanying Issues and Decision Memorandum ("*Final Results IDM*"), PR 112, ECF No. 25-3, Appx1061-1073.

## I.      RULE 56.2 STATEMENT

Habaş, a foreign manufacturer and foreign exporter of rebar from Turkey, hereby submits this memorandum of points and authorities in support of its motion for judgment on the agency record and challenges the *Final AD Results* as set forth below. Habaş appeals Commerce's final results in the 2018-2019 administrative review of hot-rolled steel flat products from Turkey, covering the period of October 1, 2018, through September 30, 2019.

## II.      ISSUES PRESENTED

### A.  Whether Commerce applied the proper currency to calculate Habaş's Home Market Sales Prices

Commerce's determination to rely on the Turkish Lira ("TL") value of Habaş's home market (or "HM") sales, rather than the reported

2

U.S. Dollar ("USD") value is inconsistent with Commerce's precedent and substantial evidence on the record. In its home market sales database, Habaş reported the gross unit price in U.S. Dollars and Turkish Lira. In the Turkish market, Turkish producers, including Habaş, rely on the USD-denominated price to avoid large fluctuations in the exchange rate. Habaş relied on this "transaction currency" when responding to Commerce's questionnaires. The factual record supports that home market sales were made and confirmed with a U.S. Dollar value; invoices were issued in Turkish Lira in accordance with Turkish law, with the U.S. Dollar exchange rate specified; and customers made their payments in U.S. Dollars.

## III.   STATEMENT OF FACTS

On October 1, 2019, Commerce published a notice of opportunity to request an administrative review of the antidumping order on hot-rolled steel flat products from Turkey covering the period of October 1, 2018 through September 30, 2019. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 52068, 52070 (Dep't Commerce Oct. 1, 2019), PR 1, Appx1082. On October 31, 2019,

3

Petitioners AK Steel Corporation, ArcelorMittal USA LLC, Nucor Corporation, SSAB Enterprises LLC, Steel Dynamics, Inc. and United States Steel Corporation also filed an administrative review request, including a request for review of Habaş. PR 3, Appx1085-1088.

Commerce subsequently published a notice of initiation of an administrative review of the antidumping order on HRS from Turkey on December 11, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67712, 67716 (Dep't Commerce Dec. 11, 2019), PR 4, Appx1093. Commerce initiated the review pursuant to Section 751(a)(1) of the Act, as amended, 19 U.S.C. § 1675(a)(1), and 19 C.F.R. § 351.213. *See id.* at 67712, Appx1089. Plaintiff was selected as a mandatory respondent in Commerce's review. *See* Memorandum from T. Gilgunn to M. Skinner, re: Respondent Selection Memorandum for Administrative Review of Antidumping Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Turkey; 2018-2019 (May 15, 2020), CR 5, PR 46, Appx1096-1101.

Habaş timely submitted its questionnaire responses throughout the proceeding. Between June 29, 2020, and July 12, 2020, Habaş

4

submitted its responses to Commerce's sections A-C questionnaires. *See generally* Habaş Section A Questionnaire Response (June 29, 2020), CR 8-10, PR 62, Appx1285, Appx1350-1360, Appx1374-1461 ("Sec. A QR"); Habaş Section B-C Questionnaire Response (July 13, 2020), CR 11-12, PR 67, Appx1628, Appx1631-1632, Appx1699-1711 ("Sec. B-C QR"). Habaş provided information to support that its home market (or "HM") sales were all quoted and agreed upon in U.S. Dollars, rather than the home market currency of Turkish lira (or "TL"). Specifically, Habaş demonstrated that the customer's order is made in U.S. Dollars, the sales confirmation is entirely in U.S. Dollars, the invoice includes the U.S. Dollar exchange rate demonstrating the agreed-upon U.S.-Dollar amount, and that the customer's payment is made in dollars. *See* Habaş Case Brief at 4 (Mar. 26, 2021), CR 154, PR 100, Appx2220 ("Habaş Case Br."); Sec. A QR at Exh. A-8, CR 8, PR 62, Appx1350-1360. On January 7, 2021, Habaş submitted its response to Commerce's questionnaire requesting supplemental information with respect to the Sections A-C questionnaires, confirming again that "all HM sales were in U.S. dollars." Habaş Supplemental Sections A-C Questionnaire

Response at 5 (Jan. 7, 2021), CR 126, PR 84, Appx1898 ("Sec. A-C SQR").

Habaş demonstrated through its questionnaire responses and written argument, *see generally* Habaş Case Br., CR 154, PR 100, Appx2210-2237, that prices are quoted and agreed to in U.S. Dollars and that its invoice value is only reported in TL to conform to Turkish VAT regulations. Habaş also provided supporting information to the record demonstrating the vast exchange rate fluctuations endemic with the Turkish currency. *See id.* at 12-15, Appx2228-2231, (citing Habaş's home market sales database, provided in Sec. B-C QR at Exh. B-2 (July 13, 2020), CR 11, PR 67, Appx1699-1711); *see also* Sec. A-C SQR at Exh. S2-4.3 (revising the home market sales listing), CR 126, PR 84, Appx2045-2057; *id.* at 3 and Exh. S2-5, Appx1896, Appx2058-2059 (providing supporting calculations, including "all information of the expense documents related to the sales of the subject merchandise are show in terms of date, TL Amount, Amount in Original Currency, Vendor Name, and Reported Amount in the exhibits.").

On February 24, 2021, the Department issued its preliminary results in which it assigned Habaş a weighted average dumping margin

AFDOCS/26086330.1

of 21.48 percent. *Certain Hot-Rolled Steel Flat Products From the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018–2019*, 86 Fed. Reg. 11227, 11228 (Dep't Commerce Feb. 24, 2021) ("*Preliminary Results*"), PR 98, Appx1049, and accompanying Preliminary Results Decision Memorandum, ("*Preliminary Results Memo*"), PR 93, Appx1011-1029. In the *Preliminary Results Memo*, Commerce deviated from its practice and relied on the Turkish lira ("TL") value of home market sales, rather than the U.S. Dollar ("USD") value. Commerce stated that it relied on the Turkish Lira sales values because these were "the only sale values that can be directly tied to the audited financial records." *Id.* at 14, Appx1024.

On August 23, 2021, the Department published its *Final AD Results*, assigning Habaş a weighted-average dumping margin of 24.32 percent. 86 Fed. Reg. at 47059, PR 115, Appx1079. In the *Final AD Results*, Commerce continued to use TL-denominated sales price for Habaş's HM sales. *See Final Results IDM* at 8-9, PR 112, Appx1068-1069. Commerce stated that use of the TL-denominated price was

appropriate because it "use{s} the sales value that can be reconciled to the company's audited financial statements." *Id.* at 9, Appx1069.

Disagreeing with Commerce's *Final Results*, as they are unsupported by substantial evidence and not in accordance with law, Habaş filed this appeal.

## IV.   STANDARD OF REVIEW

The Court must reject any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005), quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).

When reviewing Commerce's statutory interpretations, the Court applies the two-part test set forth in the U.S. Supreme Court's opinion

AFDOCS/26086330.1

in *Chevron. Union Steel v. United States*, 713 F.3d 1101, 1106-07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984)). Under *Chevron*, to determine whether an agency's interpretation of the statute is entitled to deference, the Court conducts a two-part inquiry. Under the first prong, where Congress has spoken directly to the question at issue the Court and the agency must give effect to the unambiguously expressed intent of Congress. *See Chevron*, 467 U.S. at 842-43. If, however, the statute is vague or silent on an issue, the Court may uphold Commerce's interpretation, but only so long as the interpretation is reasonable. *See id.* at 843.

## V.   ARGUMENT

### A.  Commerce's Determination Is Not In Accordance With Law And Is Inconsistent With Determinations Made In Prior Cases

This Court has previously found that "{a}gencies have a responsibility to administer their statutorily accorded powers fairly and rationally." *Anderson v. U.S. Sec'y of Agriculture*, 462 F. Supp. 2d 1333, 1339 (Ct. Int'l Trade 2006), *appeal dismissed*, 260 F. App'x 266 (Fed. Cir. 2007); *see also SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2016) ("An agency determination that is

AFDOCS/26086330.1

arbitrary is *ipso facto* unreasonable, and a determination is arbitrary when it fails to consider an important aspect of the problem *or treats similar situations in dissimilar ways*.") (internal quotations omitted) (alterations omitted) (second emphasis added) (footnote omitted). Where Commerce makes a determination different from its past determinations based on similar facts, Commerce must provide an explanation for such a departure. *See Nakornthai Strip Mill Pub. Co. v. United States*, 87 F. Supp. 2d 1303, 1308 (Ct. Int'l Trade 2008) ("Accordingly, when departing from its own precedent, Commerce must explain its departure."); *British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow {its} precedent, and if it chooses to change, it must explain why.") (citation omitted). Although the Department's "conclusions from earlier segments" may not "serve as precedent controlling" future conclusions with respect to the same antidumping or countervailing duty order, "courts 'look for a reasoned analysis or explanation' from Commerce to ensure that the agency has not abused its discretion in departing from prior analysis." *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.Ş. v. United States*, 498 F. Supp. 3d 1345, 1365 (Ct. Int'l Trade 2021)

10

(quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70

(Fed. Cir. 1998)) "{A}n agency action is arbitrary when the agency

offer{s} insufficient reasons for treating similar situations differently."

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)

(citation omitted). "{C}onsistency has long been a core interest of

administrative law, and inconsistent treatment is inherently

significant." *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340,

1355-56 (Ct. Int'l Trade 2020) (citing *Skidmore v. Swift & Co.*, 323 U.S.

134, 140 (1944).

### 1. Commerce's *Final AD Results* Are Inconsistent With Its Prior Determinations and the Law

Commerce determines whether the subject merchandise is being

sold at less than fair value by conducting a "fair comparison" between

the export price and normal value. *See* 19 U.S.C. § 1677b(a). To

calculate normal value, Commerce will consider the

> price at which the foreign like product is first sold (or, in the
> absence of a sale, offered for sale) for consumption in the
> exporting country, in the usual commercial quantities and in
> the ordinary course of trade and, to the extent practicable, at
> the same level of trade as the export price.

19 U.S.C. § 1677b(1)(B)(i). Commerce has a statutory obligation to "determine dumping margins as accurately as possible" and the impacted "U.S. industry is not entitled to a remedy in excess of the difference between foreign market value and U.S. price." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (internal quotations and citations omitted). Where the "statute is silent," Commerce's interpretation must be reasonable. *See Chevron*, 467 U.S. at 843. Here, Commerce's interpretation of the statute is inconsistent with its prior determinations and is unreasonable as it is unsupported by the record evidence. In previous reviews of hot-rolled steel from Turkey and the investigation, Commerce has consistently relied on U.S. Dollar values for home-market sales, when the transactional elements, including contracts, confirmations, and payments, were made in dollars between the respondent and the respondent's customers in the home market. Commerce's failure to do so here causes a great distortion of the margin.

Where sales in the home market are transacted in U.S. Dollars, the margin calculation should use the transaction currency ("USD" or U.S. Dollars) rather than the accounting currency. Making unnecessary

12

currency conversions have been determined to be methodological errors.
*See Welded Carbon Steel Standard Pipe and Tube Products From
Turkey*, 82 Fed. Reg. 49179 (Dep't of Commerce Oct. 24, 2017) (final AD
determ. & determ. of no shipments; 2015-2016), and accompanying
Issues and Decision Memorandum at 10 ("Here, we have converted the
dollar-denominated home market sales into Turkish lira only for
purposes of the sales-below-cost test. For purposes of calculating the
margin, we have left the dollar-denominated home market sales in U.S.
dollars."). Where the "sales at issue were determined to be dollar
denominated transactions, currency conversions from the {home market
currency} into dollars are unnecessary" and should not be made. *See
Stainless Steel Plate in Coils from the Republic of Korea*, 66 Fed. Reg.
45279, 45280 (Dep't of Commerce Aug. 28, 2001) (amend. final LTFV
determ.).

Commerce's longstanding practice is to use the currency of a
respondent's sale prices based on the currency which controls the
ultimate amount a purchaser pays for the sale. Commerce has
explained that it will use the USD-denominated home market sale
prices, as reported, when and because the USD price controls the

13

ultimate amount paid by its home market customers. Commerce has

emphasized two issues for consideration:

> (1) the price for these transactions is fixed in USD at the
> time of invoicing (*i.e.*, at the date of sale); and (2) this USD
> price controls the ultimate amount that the purchaser pays
> for the sale, {Commerce} has used the USD dollar price in
> {its} analysis.

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 84

Fed. Reg. 30694 (Dep't of Commerce June 27, 2019) (final AD determ. &

final no shipments results; 2016-2017) ("*2016-17 HRS Final Results*"),

and accompanying Issues and Decision Memorandum at 10 ("*2016-17

HRS Final Results IDM*"). The facts in *2016-17 HRS Final Results* are

similar to those here. In the *2016-17 HRS Final Results IDM*, the

respondent reported negotiating "the prices for the HM sales in

question in USD, and these prices did not change once an agreement

was reached." *Id.* at 9.  In that case, the "buyer paid the TL equivalent

amount of the USD price at the time of payment," but the respondent

"did not set prices in TL. Instead, {the respondent} set prices in USD."

*Id.* Therefore, in that case, Commerce determined that converting the

> USD amount to TL at the payment date of the Turkish sale
> (*i.e.*, what is paid by the HM customer) and then to convert
> this TL back to USD at the date of the U.S. sale would

14

> necessarily distort the HM sale prices denominated in USD,
> as they are included in normal value.

*Id.* Commerce reiterated its reasoning for relying on the U.S. Dollar (or

"USD") price and, to provide the necessary emphasis, we do to too:

> Therefore, because: (1) the price for these transactions is
> fixed in USD at the time of invoicing (i.e., at the data of
> sale); and (2) this USD price controls the ultimate amount
> that the purchaser pays for the sale, we have used the USD
> dollar price in our analysis.

*Id.* at 10.

Similarly, in this case, Habaş's home market sales are negotiated,

confirmed, and paid in U.S. Dollars (USD). *See* Habaş Case Br. at 4, 16,

Appx2220, Appx2232.  However, in these *Final Results*, Commerce

concluded that "the record supports finding that the USD-denominated

price shown on the invoice has no connection with the ultimate payment

and thus, the TL-denominated price on the invoice is the final price."

*Final Results IDM* at 10-11, PR 112, Appx1070-1071. This is

inconsistent with Commerce's review in the first administrative review

of *HRS from Turkey*.

In the second administrative review of *HRS from Turkey*,

reviewing the 2017-2018 period, Commerce again "used the gross unit

prices in the currency (*e.g.*, TL or USD) in which the sale was originally

denominated, and subsequently reported by Colakoglu in its home market sales data, for the preliminary home market sales analysis." *Certain Hot-Rolled Steel Flat Products From Republic of Turkey*, 84 Fed. Reg. 68878 (Dep't Commerce Dec. 17, 2019) (prelim. AD results & determ. of no shipments; 2017-2018), and accompanying Preliminary Decision Memorandum at 15 ("*2017-18 HRS Preliminary Decision Memo*"); *see also, Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 85 Fed. Reg. 63098 (Dep't of Commerce Oct. 6, 2020) (final AD results & final determ. no shipments; 2017-2018) ("*2017-18 HRS Review*"). Recognizing that Commerce did not issue final results with respect to Colakoglu, in this *2017-18 HRS Review*, Commerce did not change its analysis from the first administrative review. *Id.* Still, it is important to recognize that Commerce reviewed commercial activities virtually identical to Habaş's commercial activities and came to a decision different from this review. To summarize, below we provide a comparison of Habaş's commercial practice to Colakoglu's in the second administrative review of *HRS from Turkey* (purely to provide the most recent data):

AFDOCS/26086330.1

|  | **Habaş** | **Colakoglu** |
|---|---|---|
| Order Currency | USD | USD |
| Order Confirmation Currency | USD | USD |
| Invoice | TL, with USD foreign exchange ("forex") rate | TL and USD |
| Customer's Payment Currency | USD | USD |

*See* Sec. A QR at Exh. A-8, CR 8, PR 62, Appx1350-1360; Sec. B-C QR at 24, CR 11, PR 67, Appx1631; *2017-18 HRS Preliminary Decision Memo* at 15 (providing details for Colakoglu).

Like its prior reviews, Commerce's questionnaires in this case instructed Habaş to:

> Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred and net of taxes rebated or not collected when the product is exported (*e.g.*, net of value added taxes (VAT)).

Letter from T. Gilgunn to Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S., transmitting Initial Questionnaire at B-19, PR 47, Appx1152 ("DOC Initial Questionnaire").

> Report the sale price, discounts, rebates and all other revenues and expenses in currencies in which they were earned or incurred.

*Id.* at C-18, Appx1184.

17

In prior reviews, Commerce relied on this language to support its determinations to rely on the transaction currency reported in the respondent's books and records to calculate normal value. *2016-17 HRS Final Results IDM* at 9 ("Commerce's normal policy, as reflected in the questionnaire instructions to {respondent}, is that 'the sale price, discounts, rebates and all other revenues and expenses' must be reported 'in the currencies in which they were earned or incurred{.}'"); *see also* 19 U.S.C. § 1677b(f)(1)(A) ("Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.").

However, now, in these *Final AD Results*, Commerce stated that "the currency in which the sales are 'incurred' is not the sole determining factor" and that it uses "the sales value that can be reconciled to the company's audited financial statements." *Final Results IDM* at 9, PR 112, Appx1069. Then, although the USD price controlled the ultimate amount the purchaser paid for the sales, Commerce

determined that other factors led it to find that it should not use USD as the transaction currency, but, instead, to rely on TL-denominated sales prices. *Id.* at 9-12, Appx1069-1072. Importantly, in a deviation from its prior determinations in its reviews of this same order, Commerce now states that "{i}f the instructions in the AD questionnaire is the reflection of using the transaction currency, then the term would have been defined." *Id.* at 9 n.47, Appx1069. Only three years ago, and three months prior to Commerce's final results in this case, Commerce stated that its "normal policy {is} reflected in the questionnaire instructions." *2016-17 HRS Final Results IDM* at 9. Commerce does not offer any reason why its standard questionnaire language reflects its normal policy in one review but not another. As explained further below, Commerce also accepts values reported in U.S. Dollars for the home market in other contexts in this review. Commerce cannot treat similar situations in dissimilar ways and, if it does it must explain why its decision differs from its previous decisions. *See British Steel,* 127 F.3d at 1475*; SunEdison,* 179 F. Supp. 3d at 1316; *Nakornthai,* 87 F. Supp. 2d at 1276-77.

### 2. Relying on the Reported "Transaction Currency" is Consistent With Commerce's Policy and Precedent

"Transaction currency" is not defined by the statute or Commerce's regulations. "Commerce's normal policy, as reflected in the questionnaire instructions . . . is that 'the *sale price*, discounts, rebates and all other revenues and expenses' must be reported 'in the currencies in which they were earned or incurred.'" *2016-17 HRS Final Results IDM* at 9. In a different but analogous scenario, Commerce has more fully explained "transaction currency" or the "currency of the transaction." *See, e.g.,* Carlo G. Cavagna, Import Administration Policy Bulletin 98.2: *Imputed credit expenses and interest rates* (Feb. 23, 1998), *available at* https://enforcement.trade.gov/policy/bull98-2.htm (explaining that "{f}or the purposes of calculating imputed credit expenses, {Commerce} will use a short-term interest rate *tied to the currency in which the sales are denominated.* {Commerce} will base this interest rate on the respondent's weighted-average short-term borrowing experience *in the currency of the transaction.*" (emphasis added)). Commerce conducts an analysis of imputed credit expenses as part of its normal value calculation, the very same overarching normal

20

value calculation Commerce is conducting in this case, analyzing the price of sales in the home market, *i.e.*, Turkey. *Id.* (Commerce may "make{} a circumstance of sale adjustment to normal value (NV) to account for differences in credit terms." *Id.*). Again, Commerce's stated practice is to rely upon the currency in which a sale was earned or incurred, or the currency of the transaction. Here, that currency is the U.S. Dollar.

As explained above, the administrative history supports such a policy and definition of "transaction currency" in the context of prices used for a respondent's home market sales. In its investigation of *Hot-Rolled Steel Flat Products from Turkey*, which resulted in the current antidumping duty order, Commerce utilized USD-denominated prices in its margin prices. *See Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 81 Fed. Reg. 15231 (Dep't Commerce Mar. 26, 2016) (affirm. LTFV prelim. determ. & postponement of final determ.) ("*HRS Inv. Preliminary Determination*"), and accompanying Preliminary Determination Memorandum ("*HRS Inv. PDM*"); *Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 81 Fed. Reg. 53428 (Dep't Commerce Aug. 12, 2016) (final affirm. LTFV determ.) ("*HRS*

21

*Inv. Final Determination*"), and accompanying Issues and Decision Memorandum ("*HRS Inv. IDM*").

In the investigation, one of the respondents (Erdemir) reported as part of its sales process that "{t}he unit price is stated (in USD/ton) on the pro forma invoice, deviations from which are not permitted." *Eregli Demir ve Celik Fabrikalari T.A.Ş. v. United States*, 308 F. Supp. 3d 1297, 1308 (Ct. Int'l Trade 2018). Commerce accepted this reporting and, silent on the calculation, relied on the USD-denominated prices. Erdemir further explained, and Commerce again accepted, that "{t}he final payable amount constitutes the unit price from the pro forma invoice, multiplied by the actual tonnage, plus value added tax." *Id.* Although raised by Habaş in its case brief, *see* Habaş Case Br. at 4-5, CR 154, PR 100, Appx2220-2221, Commerce does not address all of these facts in the *Final Results*, but responds only in part that the Court "sustained Commerce's decision to use the TL-denominated costs from the company's accounting records to conduct a threshold analysis of quarterly costs . . . because that is 'consistent with the statute that provides for cost calculations on the basis of the exporter's books and records.'" *Final Results IDM* at 9 (citation omitted), PR 112, Appx1069.

Regardless, the Court held that "Commerce's determination to conduct its analysis in the currency in which {the second respondent} keeps its books" was reasonable. *Eregli Demir*, 308 F.Supp.3d at 1322. In this case, Commerce has not relied on Habaş's records which demonstrate that its "HM sale prices are: (1) negotiated and ordered in USD, (2) invoiced in TL in accordance with Turkish VAT regulations {with the USD exchange rate identified in the text field on the face of the invoice}; and (3) paid in USD." *Final Results IDM* at 8 (footnotes omitted), Appx1068; *see also* Sec. A QR at 14, CR 8, PR 62, Appx1285 ("{P}rices are quoted and agreed in U.S. dollars."); *id.* at Exh. A-8, Appx1350-1360.

### B. Commerce's *Final AD Results* Create Absurd Results, Inconsistent With The Record, Which Supports Relying On USD-Denominated Prices In The Home Market

Habaş disagrees with Commerce that its books and records support relying on the TL-denominated sales rather than the USD-denominated sales values to calculate normal value. *See Final Results IDM* at 10-11, PR 112, Appx1070-1071 (finding that the "information on the record supports finding that the USD-denominated price shown on

23

the invoice has no connection with the ultimate payment and thus, the TL-denominated price on the invoice is the final price."). Habaş responded to Commerce's questionnaires in the form and manner requested, providing the necessary payment documents to demonstrate that prices are quoted in and agreed to U.S. dollars, *i.e.*, "set in U.S. dollars," and, thus, Commerce should have used USD-denominated prices. *See id.* at 9, Appx1069 (recognizing that Habaş reported its home market sales accurately and completely). Habaş showed in its sales reconciliation in related parts that its sales listings are accurate and complete, when using Turkish Lira values in its accounting system and its sales currencies as U.S. Dollars.

Commerce's rationale is that the use of TL unit values is required because, in part, "the information on the record supports finding that the USD-denominated price shown on the invoice has no connection with the ultimate payment and thus, the TL-denominated price on the invoice is the final price. Notably, Habaş reported no price adjustments related to currency conversions." *Id.* at 10-11, Appx1070-1071. As explained throughout this brief, this is not the analysis used in previous reviews, nor does Commerce provide support that it only considers the

24

connection between the prices on the invoice and the ultimate payment. *See id.* at 9-11, Appx1069-1071 (citing to Commerce's questionnaire and to *Eregli Demir*). First, Commerce cites to its questionnaire to support its "practice . . . to use the sales value that can be reconciled to the company's audited financial statements." *Id.* at 9 and n.48, Appx1069. Commerce's use of questionnaire language in these *Final AD Results* is in direct contradiction to its decision that it is not normal practice to use the transaction currency, to which Commerce states "{i}f the instruction in the AD questionnaire is the reflection of using the transaction currency, then the term would have been defined." *Id.* at 9 n.47, Appx1069. Commerce is trying to use its questionnaire language to support one practice (using values that reconcile to audited financial statements) but not another (using the transaction currency), despite its prior determinations which allow for the use of the transaction currency. Commerce must, at the very least, explain this discrepancy. *See Atchinson, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (the agency has a "duty to explain its departure from prior norms."). Second, as explained above, *Eregli Demir* requires that Commerce look to the respondent's books and records. Here,

25

Habaş's books and records demonstrate that Commerce should rely on the USD-denominated sales as reported.

Specifically, Habaş reported that its customer's order is made in dollars. *See* Sec. A QR at Exh. A-8, CR 8, PR 62, Appx1350-1360. The home market sample sales demonstrate that the base price ("baz fiyat"), the extras ("Ekstralar"), and the effective price ("Efektif fiyat") are all in U.S. dollars, as are the calculated total values ("tutar"), and cost and freight (C.F.R.) destination value. *Id.* Communications with customers, confirming the sales, demonstrate that the confirmed base price, extras, effective price, and cost and freight (C.F.R.) are all in dollars. *Id.* Habaş issues an electronic invoice, which shows that the invoice value is in TL, as required by Turkish VAT regulations. *Id.* However, the unit price in USD and USD exchange rate are both included on the invoice. *Id.* Habaş also submitted evidence of payment; this bank payment voucher clearly shows that payments were made in USD. *Id.* Commerce claims that "{s}ince the bank receipt is not from Habas's bank . . . the payment document is unlikely maintained in Habas's books and records." *Final Results IDM* at 10, PR 112, Appx1070. Commerce's claim is baseless. Habaş responded to Commerce's questionnaire, providing customer

26

payment information as part of its home market sample sales reporting and submitted that "payment is made in dollars." *See, e.g.,* Habaş Case Br. at 4, CR 154, PR 100, Appx2220.

Commerce claims that it is "notable" that "Habas tied the TL sales value to its audited financial records in its {home market} sales reconciliation." *Final Results IDM* at 8, PR 112, Appx1068. Habaş explained this: its audited financial statements are necessarily in Turkish Lira. *See* Sec. A QR at Exh. A-10, CR 9, PR 62, Appx1374-1461. Of course Habaş's audited financial statements are in TL. Habaş is a Turkish company operating in Turkey, under Turkish laws requiring reporting to be done in Turkish Lira. Habaş also explained that it reported the "gross unit prices in U.S. dollars . . . in accordance with the currency in which Habaş and its customers agree when sales are booked." Sec. B-C QR at 24, CR 11, PR 67, Appx1631. Habaş also reported the "line-item total values in the transaction currency, *i.e.*, USD." *Id.* Habaş reported "the Turkish lira (TL) line-item values that are booked into the accounting system since all accounting entries must

be made in TL, regardless of the transaction currency." *Id.* at 25, Appx1632.[1]

Last, relying on the TL-denominated value, converted to U.S. Dollars, introduces an extraordinary distortion to the margin calculations because the month of the U.S. sale, August 2018, witnessed an aberrational and unique devaluation of the Turkish currency as a result of the U.S. government's imposition of additional 25 percent section 232 duties against Turkey, in addition to the original 232 duties generally applicable to U.S. trading partners. *See Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) (imposing a 25 percent import duty surcharge on steel products under section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862); *Proclamation 9772 of August 10, 2018, Adjusting Steel Imports Into the United States*, 83 Fed.

---

[1] We note, by comparison, Habaş submitted and Commerce accepted the "average age of receivables" for its payment terms because "is not able to report the date of the receipt of payment on a transaction-specific basis." *See* Sec. B-C QR at 21, CR 11, PR 67, Appx1628. Thus, in this review, Commerce has rejected Habaş's home market sales values reported in U.S. Dollars because they do not tie to the audited financial statements, but has accepted Habaş's payment dates which do not necessarily link to the invoices.

28

Reg. 40429 (Aug. 15, 2018) (imposing an additional 25 percent duty on

steel imports from Turkey). The Section 232 duties are extraordinary

examples of an endemic risk with denominating transactions in TL: the

Turkish currency fluctuates often and widely. *See* Habaş Case Br. at 12-

14, CR 154, PR 100, Appx2228-2230. Month-to-month in 2018,

differences in the foreign exchange rates range from 2.2% to 17.6% and

the percent difference changed almost every month of the year. *Id.* at

12, Appx2228; *see also* Memorandum from L. Wang to to The File, re:

Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.Ş. (Habaş)

Preliminary Margin Calculation Memorandum, Attachment III (Feb.

18, 2021), CR 144, PR 94, Appx1030-1047; Habaş Case Br. at 12-14, CR

154, PR 100, Appx2228-2230 (reproducing foreign exchange rates

provided in Commerce's data files attached to the Preliminary Margin

Calculation Memorandum). The same can be seen for 2019 and 2020.

*See* Habaş Case Br. at 12, Appx2228. Thus, to avoid the exchange rate

fluctuation risks, Turkish producers denominate transactions in U.S.

Dollars. Commerce's calculation which converts the USD-denominated

price from U.S. Dollars to Turkish Lira and back again to U.S. Dollars

introduces a distortion which the USD-Denominated transaction is

AFDOCS/26086330.1

designed to prevent in this context. Substantial evidence on the record and law support Commerce relying on the USD-denominated price *as reported* by Habaş. Relying on the USD-denominated prices represents the best information for the most accurate dumping margin.

## VI.   CONCLUSION

For the reasons set forth above, Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. request that this Court:

1. Hold that Commerce's *Final AD Results* were not in accordance with law and were not supported by substantial evidence with respect to the issue set forth above;

2. Remand the *Final AD Results* to Commerce with instructions to recalculate Habaş's AD rate; and

3. Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Matthew M. Nolan**
Matthew M. Nolan
Jessica R. DiPietro
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
202-857-6013

AFDOCS/26086330.1

*Counsel to Habaş Sinai ve Tibbi*
*Gazlar Istihsal Endüstrisi A.Ş.*

Dated: March 18, 2022

31

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's Brief in Support of its 56.2 Motion filed on March 18, 2022, complies with the word limitation requirement. The word count for Plaintiffs' 56.2 Brief, as computed by ArentFox Schiff LLP's word processing system is 5,577.

 **/s/ Matthew M. Nolan**
Matthew M. Nolan

1