# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
                                                      )
HABAŞ SINAI VE TIBBI GAZLAR                           )
ISTIHSAL ENDÜSTRISI A.Ş.,                             )
                                                      )
              Plaintiff,                              )
                                                      )
v.                                                    )          Court No. 21-00527
                                                      )
UNITED STATES,                                        )
                                                      )
              Defendant,                              )
                                                      )
              and                                     )
                                                      )
CLEVELAND-CLIFFS INC., STEEL                          )
DYNAMICS, INC., and SSAB                              )
ENTERPRISES LLC,                                      )
                                                      )
              Defendant-Intervenors.                  )
_____      )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of

International Trade, defendant, the United States, respectfully submits

this response in opposition[1] to the motion for judgment on the agency

---

[1]  Our brief was originally filed on May 23, 2022.  ECF No. 38. Pursuant to the Court's order, ECF No. 47, defendant is refiling its brief with citations to the joint appendix.

record filed by plaintiff, Habaş Sinai ve Tibbi Gazler Istihsal Endüstrisi A.Ş. (Habaş), Habaş Br., ECF No. 33.

Because the final results of the Department of Commerce in the 2018-2019 antidumping duty administrative review covering hot-rolled steel flat products from Turkey are supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court sustain Commerce's final results.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is Commerce's antidumping duty administrative review covering hot-rolled steel flat products from Turkey.  *Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 86 Fed. Reg. 47,058 (Dep't of Commerce Aug. 23, 2021) (final results admin. rev.) (*Final Results*) (P.R. 115), Appx 1078-1080, and accompanying Issues and Decision Memorandum (IDM) (P.R. 112), Appx 1061-1073.  The period of review is October 1, 2018, through September 30, 2019.

## II.   Issue Presented For Review

Whether Commerce's reliance on the Turkish Lira value of Habaş's home market sales, which reconciled to Habaş's audited financial statements, was supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

In 2016, Commerce issued an antidumping duty order covering hot-rolled steel flat products from Turkey.  *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016) (antidumping duty order).

On December 11, 2019, Commerce initiated its third administrative review of the antidumping duty order.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712, 67,716 (Dep't Commerce Dec. 11, 2019) (P.R. 4), Appx1089-1095.  Commerce selected Habaş as the sole mandatory respondent. *See* Respondent Selection Memorandum (P.R. 46, C.R. 5), Appx1096-1101.

In June and July 2020, Habaş timely responded to sections A-C of
Commerce's questionnaire.  *See* Habaş Section A Questionnaire
Response (June 29, 2020) (P.R. 62, C.R. 8-10) (Sec. A QR), Appx1265-
1600; Habaş Section B-C Questionnaire Response (July 13, 2020) (P.R.
67, C.R. 11-12) (Sec. B-C QR), Appx1601-1887.  In January 2021, Habaş
timely responded to Commerce's supplemental questionnaire regarding
sections A-C.  *See* Habaş Supplemental A-C Questionnaire Response
(Jan. 7, 2021) (P.R. 84, C.R. 126) (Sec. A-C SQR), Appx1888-2209.  In its
home market sales data, Habaş reported the USD price, USD sales
value (*i.e.*, quantity * USD price), and the TL sales value.  *See* B-C QR
at 24 & Exhibit B-2, Appx1631 & Appx1699-1711.

Commerce published its preliminary results on February 24, 2021.
*See Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*,
86 Fed. Reg. 11,227 (Dep't Commerce Feb. 24, 2021) (prelim. results
admin. rev.) (P.R. 98) (*Preliminary Results*), Appx1048-1051 and
accompanying preliminary decision memorandum (P.R. 93) (PDM),
Appx1011-1029.  In the *Preliminary Results*, Commerce found that
"Habaş reconciled its home market sale values in Turkish lira (TL) to
its audited financial records."  PDM at 14, Appx1024.  Accordingly,

4

Commerce preliminarily determined, "{b}ecause the sales values in TL are the only sale values that can be directly tied to the audited financial records, we divided the home market sale values in TL . . . by sales quantity . . . to derive a home market unit price denominated in TL." *Id.* Commerce preliminarily determined a weighted-average dumping margin for Habaş of 21.48 percent. *Preliminary Results*, 86 Fed. Reg. at 11,228, Appx1049.

Habaş and AK Steel Corporation and Cleveland-Cliffs Steel LLC (petitioners) timely submitted case briefs. *See* Habaş Case Br. (Mar. 26, 2021) (P.R. 100, C.R. 154), Appx2210-2237; Petitioners Case Br. (Mar. 26, 2021) (P.R. 101), Appx2238-2241. The petitioners timely submitted a rebuttal brief on April 2, 2021. Petitioners Rebuttal Br. (April 2, 2021) (P.R. 103, C.R. 155), Appx2242-2250. In its case brief, Habaş argued that Commerce should have used the U.S. dollar (USD) value of Habaş's home market sales rather than the TL value because the home market sales were made in USD, and the TL value was used as the "accounting currency." Habaş Case Br. at 2, Appx2218. Habaş asserted that Commerce has a consistent practice of using USD values for home-market sales when the "transactional elements (contracts,

5

confirmations, and payments)" were made in USD, "even though the accounting registrations of the sales were in the local currency." *Id.* at 3, Appx2219. In its rebuttal, the petitioners argued that Commerce correctly relied on the TL value of the home-market sales because "Habaş's home market sales {have} *not been reconciled to the financial statements*, and thus Commerce *may not rely on those USD values in the antidumping calculations*." Petitioners Rebuttal Br. at 6-7 (emphasis in original), Appx2247-2248.

Commerce published the final results on August 23, 2021. For the final results, Commerce continued to rely on the TL value for Habaş home-market sales "{b}ecause Habaş demonstrated that its {home-market} sales were reported accurately and completely in only the TL-denominated sales values, but not the claimed USD sales values{.}" IDM at 9, Appx1069. Commerce disagreed that its practice has been to use the "transaction currency," explaining that its practice has been "to use the sales value that can be reconciled to the company's audited financial statements." *Id.* After correcting certain cost adjustment issues raised by the petitioners, *see* IDM at 13, Appx1073, Commerce calculated a final weighted-average dumping margin for Habaş of 24.32

percent. *Final Results*, 86 Fed. Reg. at 47,059, Appx1079.  This action
followed.

<h2 style="text-align:center;"><u>SUMMARY OF ARGUMENT</u></h2>

Commerce reasonably relied on the TL values of Habaş's home
market sales, rather than the USD values, to calculate normal value
because the TL values reconciled to Habaş's audited financial
statements.  Despite Habaş's assertion that Commerce's practice is to
rely on the "transaction currency," Commerce explained that it relies on
sales that can be reconciled to a respondent's audited financial
statements because doing so ensures that the respondent's reported
sales are complete and reliable.

Habaş similarly argues that Commerce's determination is
inconsistent with prior reviews where Commerce relied on USD values.
The difference, as Commerce explained, is that in those reviews, the
record showed that the USD values controlled the ultimate amount
paid.  Here, by contrast, the record supports Commerce's use of TL
values.  Habaş has not demonstrated that the USD values control the
ultimate amount paid because Habaş cannot link payments to invoices
on a transaction-specific basis, therefore does not know the exchange

rate in effect on the date of payment for a specific invoice, and because the sample sale documentation Habaş provided shows that the USD amount paid does not match the invoiced amount.  In light of this factual difference between this administrative review and prior reviews, Commerce did not act arbitrarily by using the TL values.

Habaş's argument that Commerce's reliance on the TL values creates distortion because of a change in the exchange rate between the date of its U.S. sales and the home market sales fails because the antidumping statute unambiguously directs Commerce to use the exchange rate in effect on the date of sale of the subject merchandise.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful.  *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial

evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing deference to Commerce's factual findings). Thus, the Court may not substitute its judgment for Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual

determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute that it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If so, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). Indeed, "the whole point of *Chevron* is to leave the

10

discretion provided by the ambiguities of a statute with the implementing agency." *Id.* (citation omitted); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).  In that circumstance, "Commerce may perform its duties in the way it believes most suitable." *Id.*  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute.  *Fujitsu*, 88 F.3d at 1039.

## II.   Statutory Framework For Calculation Of Antidumping Duties

The Tariff Act of 1930 establishes a remedial regime to combat unfair trade practices.  Under that regime, Commerce imposes duties upon imported products that are sold—or likely to be sold—in the

United States "at less than fair value" to the detriment of a domestic industry. 19 U.S.C. §§ 1673; 1677(34). When an interested party files a petition on behalf of a United States industry claiming that imported products are being dumped, Commerce initiates an antidumping duty investigation. 19 U.S.C. § 1673a. As part of that investigation, Commerce calculates the "normal value" of the imported goods (*i.e.*, home market price) and compares that price with the price at which the imported goods are sold in the United States. *See id.* §§ 1677(35), 1677b(a).

If Commerce finds that a foreign producer or importer is selling its goods below normal value, it makes an affirmative determination of dumping. The United States International Trade Commission (ITC), in turn, determines whether such dumping has "materially injured" or threatened material injury to a United States industry. *Id.* § 1673d(b)(1).

If Commerce makes a final determination that "the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value," and if the ITC makes a final determination that a U.S. industry has suffered or is threatened with material injury,

Commerce issues an antidumping duty order. *Id.* § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. pt. 207; 19 C.F.R. §§ 351.205(a), 351.210(a). Such an order imposes a duty in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price), which is referred to as the dumping margin.

III.   **Commerce's Use Of The TL Value Of Habaş's Home Market Sales Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

For the final results, Commerce appropriately relied on the TL value of Habaş's home-market sales because "the sales values in TL are the only sale values that can be directly tied to the audited financial records." *See* IDM at 8, Appx1068. As Commerce explained, "{b}ecause Habaş demonstrated that its {home-market} sales were reported accurately and completely in only the TL-denominated sales values, but not the claimed USD sales values, we find that only the TL-denominated sales values are reliable for calculating {normal value}." *Id.* at 9, Appx1069.

Commerce supported its determination with substantial record evidence. As Habaş acknowledges, its audited financial statements are

in TL.  *See* IDM at 10 ("The {home market} sales reconciliation uses only TL-denominated values . . . ."), Appx1070; Habaş Br. at 27 ("Of course Habaş's audited financial statements are in TL.").  Although Habaş's home market sales were negotiated and ordered in USD and paid in USD, they were invoiced in TL and Habaş reported the sales values in both TL and USD in its home market sales database.  IDM at 8, Appx1068; B-C QR at 24 & Exhibit B-2, Appx1631 & Appx1699-1711. Notably, it was these reported sales values *in TL* that Habaş reconciled to its audited financial statements.  IDM at 8 ("{T}he sales values in TL are the only sale values that can be directly tied to the audited financial statements." (citing PDM at 14), Appx1068).  Therefore, Commerce reasonably relied on those TL values to determine normal value.  *Id.*  As Commerce explained, "{b}ecause Habas demonstrated that its {home market} sales were reported accurately and completely in only the TL-denominated sales values, but not the claimed USD sales values, we find that only the TL-denominated sales values are reliable for calculating {normal value}."  *Id.*

Moreover, Habaş's sample home-market sale supports Commerce's reliance on sales values that can be reconciled to its audited financial

statements.  Specifically, although Habaş submitted a payment
confirmation showing payment from its customer in USD, that payment
amount did not match to any price shown on the associated invoice.  *See*
Sec. A QR at Exhibit A-8, Appx1350-1360.  Additionally, Habaş
acknowledged that it does not track the date of payment in its
accounting system and cannot match specific invoices with payments.
*See* IDM at 10 (stating that Habaş reported it "is not able to report the
date of the receipt of payment on a transaction-specific basis because its
information system does not link payments to invoices" (citing Sec. B-C
QR at 21), Appx1070 (citing Appx1628).  Therefore, Commerce
reasonably determined that "the USD-denominated price shown on the
invoice has no connection with the ultimate payment and thus, the TL-
denominated price on the invoice is the final price."  IDM at 10-11,
Appx1070-1071.  In sum, Commerce was presented with TL values that
were stated on Habaş's invoices and reconciled to Habaş's audited
financial statements (also in TL), or USD values that did not appear
consistent with the actual amounts paid and which were not reconciled
to Habaş's audited financial statements.  Accordingly, Commerce
reasonably relied on the TL values to determine normal value.

15

Habaş asserts that Commerce's reliance on the TL-denominated value of its home-market sales is inconsistent with Commerce's prior determinations.  Habaş Br. at 12-13.  As Commerce explained, however, the "cases cited by Habaş are not analogous to this administrative review."  IDM at 10, Appx1070.  The cases Habaş cites for the proposition that "unnecessary" currency conversions should not be made involved situations where the USD amount was controlling.  For example, in *Stainless Steel Korea*, a WTO panel found that "the dollar amount appearing on the sales invoice was controlling, while the won amount appearing on tax and certain shipment invoices and noted in {the respondent's} accounts *played no role* in determining the amount the purchaser ultimately would pay."  *Stainless Steel Plate in Coils from the Republic of Korea*, 66 Fed. Reg. 45,279, 45,280 (Dep't Commerce Aug. 28, 2001 (amend. final determ.) (emphasis added).  Here, however, Commerce explained that "the exchange rate in effect on the payment date is unknown to Habaş because it does not know the payment date of each invoice{.}"  IDM at 10, Appx1070.

Moreover, as explained above, Habaş's sample sale demonstrated that the payment amount in USD does not match the USD amount

listed on Habaş's invoices. *Id.* ("{T}he payment amount apparently has no connection with the USD price and quantity shown on the invoice (*i.e.*, the payment amount does not equal USD price times quantity, or {} USD price times quantity plus tax).").  Therefore, because it was the TL values that reconciled with Habaş's audited financial statements, Commerce reasonably did not find that the USD values were "controlling."

Habaş asserts that Commerce, in determining to use USD values in prior determinations, has emphasized that:  "(1) the price for these transactions is fixed in USD at the time of invoicing (*i.e.*, at the date of sale); and (2) this USD price controls the ultimate amount that the purchaser pays for the sale{.}"  Habaş Br. at 13-14.  Contrary to Habaş's assertions, however, Habaş has failed to demonstrate that the USD price controls the amount the customer paid for Habaş's home-market sales.  As explained, Habaş's sample sales documentation shows that the USD amount paid *does not* match the USD amount on the invoice provided.  IDM at 10, Appx1070.  Rather than speculate as to the reasons that the values differed, Commerce relied on the TL values that reconciled to Habaş's audited financial statements.  Commerce's choice

17

was reasonable because it ensured that the reported sales were accurate and complete, which is a "prerequisite for calculating an accurate weighted-average dumping margin."  IDM at 8, Appx1068.

Habaş argues that Commerce's finding that the USD amount shown on the invoice has no connection to the USD amount paid is inconsistent with Commerce's findings in the first administrative review of the order.  Habaş Br at 15.  But Habaş overlooks the differences in the records between these different administrative proceedings.  In the first review, Commerce examined a different company as the mandatory respondent, Colakoglu.  Based on the facts of that record, Commerce determined that the USD amount did not change once an agreement was reached and that "the buyer paid the TL equivalent amount of the USD price at the time of payment." *Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 84 Fed. Reg. 30,694 (Dep't Commerce June 27, 2019) (final results admin. rev.), and accompanying IDM at 9 (First Rev. IDM).  Thus, Commerce found that "the TL amount shown on the invoice represents an estimate of what the final TL amount will be at the time of payment."  *Id.*  In other words, in the first review the USD amount *controlled* the TL amount

paid, which was "based on the USD price set on the date of sale and the exchange rate in effect at the time of payment." *Id.*

Here, by contrast, Habaş cannot match payments to invoices and therefore cannot identify the exchange rate in effect on the date of payment for any specific invoice. *See* IDM at 10, Appx1070. Moreover, because the payment provided does not match the USD value shown on the invoice, the record does not establish that the USD price *controls* the ultimate amount paid. *See id.* Instead, the record establishes that Habaş was able to reconcile the *TL values* of its HM sales to the TL values in its audited financial statements, and notably did so *without* making any adjustments for currency conversions. *Id.* at 10-11, Appx1070-1071. This suggests that the USD values were not controlling because, if they were, adjustments for currency conversion from USD to TL would be necessary for an accurate reconciliation.

Habaş next asserts that Commerce's determination is inconsistent with the second administrative review. Habaş Br. at 15-16. As an initial matter, Habaş acknowledges that Commerce did not issue a final

determination for the second administrative review.[2]  *Id.* at 16.

Regardless, Commerce preliminarily examined the same company,

Colakoglu, in the second administrative review that it examined in the

first administrative review.  *See Certain Hot-Rolled Steel Flat Products*

*From the Republic of Turkey*, 84 Fed. Reg. 68,878 (Dep't Commerce Dec.

17, 2019), and accompanying PDM at 1.  Therefore, Colakoglu's practice

of using the USD values to *control* the ultimate amount would also

distinguish Commerce's preliminary determination in the second

administrative review from its determination here.  *See id.* at 15

("Colakoglu reported that it converted the USD value to the TL-

equivalent using the exchange rate from the Turrkish Republic Central

Bank on the on the date it issued its home market invoice.").

 Next, Habaş argues that Commerce's questionnaire reflects its

normal practice to "rely on the transaction currency reported in the

respondent's books and records to calculate normal value."  Habaş Br.

at 17-18.  Commerce's questionnaire, however, merely contains

---

[2] After litigation stemming from the investigation, Colakoglu was
excluded from the order.  *See Certain Hot-Rolled Steel Flat Products
From Turkey*, 85 Fed. Reg. 29,399 (Dep't Commerce May 15, 2020)
(notice of revocation of antidumping duty order, in part).

instructions for how to *report* sales.  *See* Initial Questionnaire at B-19
(P.R. 47) ("Report the sale price, discounts, rebates and all other
revenues and expenses in the currencies in which they were earned or
incurred . . . ."), Appx1152.  Here, Habaş's reporting included both USD
values and TL values on its invoices.  IDM at 8, Appx1068.  Crucially,
Habaş's TL values reconciled to the TL values of Habaş's audited
financial statements, and Commerce explained that its practice has
been "to use the sales value that can be reconciled to the company's
audited financial statements."  *Id.* at 9, Appx1069.  Notably, although
Habaş asserts that "the USD price controlled the ultimate amount the
purchaser paid for the sales," Habaş fails to cite any record evidence
*demonstrating* that the USD price controlled the amount paid.  *See*
Habaş Br. at 18.  Instead, as explained above, Habaş cannot match
specific payments to invoices, does not track a specific payment date of
an invoice, and the USD payment Habaş provided does not match the
USD invoice amount.  *See* IDM at 10, Appx1070.

Additionally, Habaş claims that "Commerce does not offer any
reason why its standard questionnaire language reflects its normal
policy in one review but not another."  Habaş Br. at 19.  Habaş's claim

is without merit for several reasons.  First, when Commerce stated that
the questionnaire instructions reflect its normal policy, it was with
respect to how respondents must report their sales, *see* First Rev. IDM
at 9.  Commerce did not state that it will use the "transaction currency"
in its normal value calculations.  As Commerce explained here,
"transaction currency" is not a defined term and does not appear in
Commerce's questionnaire, its regulations, or the antidumping statute.
IDM at 9, Appx1069.  Second, Commerce's questionnaire instructs that
a respondent's home market sales database must reconcile to its
financial statements.  *Id.* at 9 n.48, Appx1069 (citing Initial
Questionnaire at B-6, Appx1139).  Therefore, insofar at the
questionnaire reflects Commerce's "normal policy," it supports
Commerce's reliance on the TL values here because they were the
values that Habaş reconciled to its audited financial statements.  Third,
although Habaş asserts that Commerce failed to explain why it is
treating similar situations differently, Habaş Br. at 19, Commerce
explained both how the situations from past reviews differ and the
reasons for the differing treatment (*i.e.*, that the respondent in prior
reviews knew the dates of payment and applicable exchange rates, so

the USD amount was controlling, whereas here Habaş does not track such information).  IDM at 10, Appx1070.  Therefore, Commerce did not act arbitrarily by relying on USD values in prior reviews and TL values here.

Habaş next attempts to use Commerce's stated policy regarding imputed credit expenses to support its notion of "transaction currency," Habaş Br. at 20, but valuing short-term borrowing costs is not the same as determining the values to rely on for normal value, which requires a complete, reliable universe of sales.  IDM at 8, Appx1068.  Commerce ensures that a respondent's home-market sales database is complete and reliable by relying on sales that reconcile to a respondent's audited financial statements, as it did here.  *Id.*  In short, reliance on the "currency of the transaction" in the imputed credit expenses context does not require that Commerce use the "currency of the transaction" here, where the TL values are the ones the respondent reconciled to its financial statements.

Habaş further asserts that Commerce has not relied on Habaş's records.  Habaş Br. at 23.  That is incorrect.  Habaş conveniently ignores, however, that not only are its sales invoiced in TL, but also

that it reported these TL values alongside USD values in its home-market sales database and reconciled the reported TL values to its audited financial statements.  IDM at 8, Appx1068.  Accordingly, by relying on the reconciled TL values, Commerce specifically *is* relying on Habaş's records.

Habaş argues that Commerce's determination "create{s} absurd results, inconsistent with the record, which supports relying on USD-denominated prices in the home market."  Habaş Br. at 23.  But Habaş merely reiterates its unfounded assertions that Commerce has used a different analysis here than in prior reviews and that Commerce's questionnaire supports using the "transaction currency."  *Id.* at 24-25.  Habaş fails to identify any record evidence that calls into question Commerce's conclusion that the "USD-denominated price shown on the invoice has no connection to the ultimate payment{.}"  *Id.* at 24.  Nor is it true that Commerce "only considers the connection between the prices on the invoice and the ultimate payment."  *Id.* at 24.  Instead, as Commerce explained, the issue is whether Habaş's reported sales can be reconciled to its financial statements, thereby establishing that the reported sales are complete and reliable.  IDM at 9, Appx1069.  In the

past cases cited by Habaş, relying on USD values was nevertheless possible because the respondent could track the specific date of payment and exchange rate in effect on that date. *Id.* at 10, Appx1070. Habaş, by contrast, acknowledges that it "is not able to report the date of the receipt of payment on a transaction-specific basis." Habaş Br. at 28 n.1. Habaş cites Commerce's acceptance of its "payment dates which do not necessarily link to the invoices" as contradictory to Commerce's decision not to use its USD-denominated home-market sales values. *Id.* Habaş fails to recognize, however, that Commerce could rely on its reported values in TL despite Habaş not reporting payments on a transaction-specific basis only because the TL values reconciled to Habaş's audited financial statements, and therefore Commerce determined the reported sales in TL were complete and reliable.

Finally, Habaş argues that relying on the TL-denominated values "introduces an extraordinary distortion to the margin calculations because the month of the U.S. sale, August 2018, witnessed an aberrational and unique devaluation of the Turkish currency{.}" Habaş Br. at 28. As an initial matter, Commerce's calculation is not "convert{ing} the USD-denominated price from U.S. Dollars to Turkish

Lira and back again to U.S. Dollars," as Habaş claims.  Habaş Br. at 29.

Rather, Commerce relied on Habaş's reported TL values, which

reconciled to Habaş's audited financial statements, *see* IDM at 9,

Appx1069, and converted those TL values to USD based on the

applicable Federal Reserve exchange rates for comparison with Habaş's

U.S. sales *as directed by the antidumping statute*.  *See* IDM at 11 ({O}ur

preliminar{y} margin calculation converted the TL-denominated prices

of selected August 2018 {home market} sales to USD-denominated

prices using the exchange rate in effect on August 2, 2018 (*i.e.*, 0.21),

certified by the Federal Reserve Bank, consistent with {19 U.S.C. §

1677b-1} and 19 C.F.R. {§} 351.415."), Appx1071.  Specifically, the

statute directs Commerce to use "the exchange rate in effect for the date

of sale of the subject merchandise," which is the merchandise sold in the

United States.  19 U.S.C. § 1677b-1.  Habaş does not claim that

Commerce failed to follow the statute.

In sum, Commerce's determination is supported by substantial

evidence because Commerce reasonably relied on the TL-values of

Habaş's home market sales because they could be reconciled to Habaş's

audited financial statements.  IDM at 8, Appx1068.  Any alleged

"distortion" introduced by Commerce's calculation is the result of the statutory scheme. *See id.* at 11-12 ("Commerce only uses exchange rates in effect on the date of sale of the subject merchandise and certified by the Federal Reserve."), Appx1071-1072. Habaş may disagree with the results of Commerce's compliance with the statute, but that does not demonstrate any reversible error. Further, Commerce reasonably explained its determination and differences between its determination here and prior reviews. Commerce therefore did not treat similar situations differently or act arbitrarily. For these reasons, Commerce's reliance on Habaş's reported TL values to calculate the value of home market sales should be sustained.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain the final results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Kelly A. Krystyniak
KELLY A. KRYSTYNIAK

OF COUNSEL:                Trial Attorney
PAUL K. KEITH              U.S. Department of Justice
Senior Attorney            Civil Division
Office of the Chief Counsel Commercial Litigation Branch
for Trade Enforcement and  P.O. Box 480, Ben Franklin
Compliance                 Station
U.S. Department of Commerce Washington, D.C. 20044
Washington, D.C.           Tel: 202-305-0163
                           Email: Kelly.a.Krystyniak
                           @usdoj.gov

August 25, 2022            *Attorneys for Defendant*

28

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 5,066 words.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Kelly A. Krystyniak